# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1567

No. 22-1579

_____

Lowell Lundstrom, Jr.

*Plaintiff - Appellee/Cross Appellant*

v.

Watts Guerra LLP

*Defendant - Appellant/Cross Appellee*

Daniel M. Homolka, P.A.; Daniel M. Homolka; Mikal C. Watts

*Defendants*

_____

Appeals from United States District Court
for the District of South Dakota - Northern

_____

Submitted: December 15, 2022
Filed: March 23, 2023

_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.

_____

LOKEN, Circuit Judge.

This case is part of the mass tort and class action litigation arising out of the 2011 decision by Syngenta to commercialize genetically modified corn seed without Chinese approval. When China banned importation of U.S. corn with the modified trait, the price of corn in the U.S. plummeted, causing serious financial injury to corn producers throughout the country. Numerous class action lawsuits were filed against Syngenta defendants and consolidated in the District of Kansas by the Judicial Panel on Multidistrict Litigation. Watts Guerra LLP ("Watts Guerra"), an experienced mass tort litigation firm headed by Mikal Watts, instead filed mass tort lawsuits by individual farmers against Syngenta in twenty-two corn-producing States.

To carry out this complex undertaking, Watts Guerra entered into attorney referral and fee sharing agreements with referral lawyers, including a Minnesota attorney, Daniel M. Homolka, and his law firm, Daniel M. Homolka, P.A. ("Homolka P.A."). Homolka's responsibilities included hiring media vendors to persuade farmers to join Watts Guerra's mass tort litigation against Syngenta in Minnesota state court, often at town hall meetings arranged by Homolka's "acquisition team" and attended by Watts. In a December 2014 oral agreement, Homolka engaged Lowell Lundstrom, Jr., a South Dakota farmer with marketing experience, to help "sign up clients" by organizing town hall meetings, establishing a web domain, producing an infomercial, managing media buys, and so forth. This oral contract is the center of the dispute on appeal.

Ultimately, Watts Guerra took its Minnesota mass tort cases to trial in September 2017, while trials in MDL bellwether cases were proceeding elsewhere. Before a verdict in the Minnesota trial, Syngenta settled all pending mass tort and class action cases for $1.75 billion. Following the settlement, Lundstrom renewed prior complaints that he was owed money under the oral contract. In February 2019, he filed this suit against Homolka, Homolka P.A., Watts Guerra, and Watts, alleging he is owed (1) $10,000 per month as leasing payments from October 2015, the first month he stopped receiving payments, until the September 2017 settlement; (2) a

promised $50,000 truck reimbursement; and (3) a $3.4 million bonus. After a November 2021 trial, the jury returned a unanimous verdict for Lundstrom, finding that Homolka breached the oral contract, acting as agent of Homolka P.A. and Watts Guerra. The jury awarded $175,000 in compensatory damages with no prejudgment interest. The district court[1] denied Watts Guerra's renewed motion for judgment as a matter of law and Lundstrom's motion for a new trial either because the damage award was inadequate or because the jury reached a compromise verdict. Watts Guerra and Lundstrom cross appeal these rulings. We affirm.

## I. Background

Lundstrom became involved in the Syngenta litigation when he told his Minnesota attorney, Dan Rasmus, that Lundstrom's media experience could help sign up farmers in Rasmus's corn litigation. Lundstrom explained his media concepts to Rasmus and his law partner, Jim Hovland. Hovland introduced Lundstrom to Homolka in a December 2014 conference call as "Watts's Midwest litigation coordinator." The oral contract at issue was first discussed at a 30-minute meeting at Hovland's Minnesota law office on December 15, 2014, attended by Lundstrom, Rasmus, Hovland, Homolka, and Hector Eloy Guerra, a nonlawyer consultant described by Homolka as Mikal Watts's "right hand man." Lundstrom testified that at one point, "the conversation in the room is about fee sharing with nonlawyers, and that you can't have anything in writing that's related to sharing in fees." Homolka said, "That's right. But you can give a bonus. . . . [T]hat's how guys like [me] get paid." Lundstrom exhibited domain names he had purchased including "lostcornincome." Homolka said, "That's the one," and offered to buy it. Lundstrom declined to sell the name but it became a central part of his media efforts to "acquire" farmers for Watts Guerra's mass tort cases. Homolka told Lundstrom the goal was

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

signing up six million acres. Lundstrom asked, "how long are we going to be working on this project?" Homolka said, "We're going to get paid all the way through, right up until this thing settles or it's dismissed."

The meeting ended with Lundstrom saying he would have to "crunch some numbers" to determine how much it would take for him to work on the project. At a second meeting in late December, Homolka asked, "Have you thought about that number?" Lundstrom replied, "$10,000 a month for media placement and to lease lostcornincome.com," or $3,750 for "town hall meeting support." Homolka said "let's do the [former]." Homolka testified that Lundstrom was only to be paid according to approved budgets when his team "went out" to acquire new farmer plaintiffs. Lundstrom testified he was not told about a budget approval process.

Watts and Homolka testified their agreement was that Watts Guerra would pay acquisition expenses in accordance with budgets submitted by Homolka and approved by Watts Guerra and the bank that was financing its upfront expenses to sign up farmers for mass tort litigation. Watts approved a budget paying Lundstrom $10,000 per month for media leases. Watts Guerra paid Lundstrom $10,000 per month from January through September 2015, consistent with Homolka's budgets for Phase 1 (planting season) and Phase 2 (harvest season). The payments included $1.3 million paid to Lundstrom's personal company for media vendor expenses. Watts testified that his funding source approved phase 3 budgets in other States but refused to approve Homolka's Phase 3 budget for Minnesota because Lundstrom could not account for his expenditures. Watts Guerra stopped paying Lundstrom $10,000 per month on the Syngenta project. Lundstrom testified he was first told of budget restrictions in the fall of 2015; he prepared a budget at Homolka's request and was told it was approved. Homolka paid Lundstrom $172,000 in 2016. Watts testified he was unaware of these payments and that Homolka was free to have his own agreement with Lundstrom.

-4-

Lundstrom testified that Homolka said he would pay up to $50,000 to help Lundstrom purchase a new truck for his extensive travel to town hall meetings to recruit Syngenta plaintiffs. Homolka admitted that he made that offer and said it was included in the many media expense reimbursement payments made to Lundstrom's company. Lundstrom testified he was never paid for the truck.

Lundstrom testified that, in a February 13, 2015 phone call, Homolka asked, "what's it going to take get that farm situation squared away?" Lundstrom said, "about $1.7 million." Homolka said, "you're going to need $3.4" in an upper tax bracket; "this is the project of a lifetime. . . . We need your best effort." Homolka testified, "I told him . . . that I would consider a discretionary bonus . . . depending on how the project goes out and as a gratitude payment for the people that work for me." Watts testified he would never approve paying a bonus to consultants for helping persuade farmers to join Watts Guerra's mass tort lawsuits.

## II. Discussion

**A. Watts Guerra's Appeal.** The jury found that Homolka breached the oral contract with Lundstrom, acting as agent for Homolka P.A. and for Watts Guerra. Watts Guerra argues the district court erred in denying its renewed motion for judgment as a matter of law. We review this issue *de novo*, viewing the facts in the light most favorable to the verdict. See CRST Expedited, Inc. v. Swift Transp. Co. of Arizona, LLC, 8 F.4th 690, 697 (8th Cir. 2021).

Watts Guerra argued to the district court that it is not liable for Homolka's breach of contract because Homolka lacked both actual and ostensible agency authority to bind Watts Guerra as principal to Homolka's broken promises. The district court concluded that Homolka was an actual agent of Watts Guerra but exceeded the scope of that authority "when making the broken promises to Lundstrom." The court denied Watts Guerra judgment as a matter of law because the

jury could reasonably find Watts Guerra liable based on an ostensible agency relationship. Lundstrom v. Homolka, et al., No. 1:19-CV-01006-CBK, 2022 WL 483449 (D.S.D. Feb. 16, 2022). We agree and therefore need not consider Lundstrom's argument that Homolka also had actual authority to bind Watts Guerra.

Under South Dakota law, "a principal will be liable for contracts made in its behalf by an agent if the agent was *authorized* to enter into the agreements." Fed. Land Bank of Omaha v. Sullivan, 430 N.W.2d 700, 701 (S.D. 1988) (citation omitted). Actual authority is authority the principal "intentionally confers upon the agent, or . . . *allows the agent to believe himself to possess*." Id. at 702 (emphasis in original); see S.D. Codified Laws § 59-3-2. Here, Watts Guerra granted Homolka and Homolka P.A. actual authority to organize a team including media vendors such as Lundstrom to persuade farmers to join Watts Guerra's mass tort litigation against Syngenta in Minnesota and South Dakota, with Watts Guerra funding these efforts through a budget approval process.

The testimony makes clear that Watts Guerra gave Homolka considerable discretion in contracting with nonlawyer consultants such as Lundstrom. Watts Guerra claims Homolka exceeded his authority by making commitments Watts Guerra would never have approved. To the extent that is true, South Dakota law will imply an "ostensible" agency relationship if Watts Guerra "intentionally, or by want of ordinary care" caused Lundstrom to believe, "in good faith, and without negligence," that Homolka was serving as Watts Guerra's agent in making a contractual commitment. Dahl v. Sittner, 429 N.W.2d 458, 462 (S.D. 1988); see Kasselder v. Kapperman, 316 N.W.2d 628, 630 (S.D. 1982). The Supreme Court of South Dakota has observed that "[s]trictly speaking, ostensible agency is no agency at all; it is in reality based entirely on an estoppel." Sullivan, 430 N.W.2d at 701. "[W]here it appears that the principal knew, or by a proper supervision of the affairs of the agency ought to have known, of the acts of the agent . . . he is estopped as

-6-

against innocent third persons from denying the power of the agent to act." Baldwin v. National College, 537 N.W.2d 14, 18 (S.D. 1995) (quotation omitted).

Whether an ostensible agency relationship existed that binds Watts Guerra to Homolka's contractual commitments to Lundstrom was an issue of fact for the jury. See Dahl, 429 N.W.2d at 462-63. Here, because Lundstrom is suing for breach of an oral contract, the first question the jury had to determine was the terms of the contract. Merely because the jury found that Homolka breached the contract does not mean, as Lundstrom assumes, that the jury found Homolka breached all the contract terms Lundstrom asserted. As the district court observed, "There are great risks to oral contracts. We see that 'in spades' here." Lundstrom, 2022 WL 483449 at *9.

The first alleged "broken promise" was that Lundstrom would be paid $10,000 per month for media leases "right up until this thing settles or it's dismissed." Homolka was introduced to Lundstrom as "Watts's Midwest litigation coordinator." Watts admitted that he approved Homolka paying Lundstrom $10,000 per month for media leases beginning in January 2015 even though other consultants were paid differently. Watts Guerra paid Lundstrom $10,000 per month for most of 2015, in addition to reimbursing his substantial media expenses. Lundstrom testified he never would have committed extensive resources to a project that was terminable by Watts Guerra at will. A reasonable jury could find that Watts Guerra was bound on an ostensible agency theory by Homolka's promise to pay Lundstrom $10,000 per month for the term of months the jury found.

We reach the same conclusion regarding the second alleged broken promise, to pay Lundstrom up to $50,000 to purchase a new truck. Lundstrom arranged and attended many town hall meetings at which Watts persuaded farmers to join their Syngenta claims in Watts Guerra's mass tort litigation. In an early conversation, Lundstrom testified that Homolka said he would pay for a new truck because he did not want Lundstrom driving to these events in his ancient truck. That was consistent

with the purpose of the massive media campaign Lundstrom was conducting. The dispute at trial was not about whether the truck was too extravagant or unnecessary, only whether Lundstrom had been paid by Watts Guerra or Homolka. Watts Guerra argues that apparent authority must stem from the actions of the principal, not the agent. See Am. Prairie Const. Co. v. Hoich, 560 F.3d 780, 794 (8th Cir. 2009). True enough, but here Watts Guerra gave Homolka discretion in contracting with nonlawyer consultants such as Lundstrom and paid Lundstrom over one million dollars for his media services. Viewing this evidence in the light most favorable to the verdict, a reasonable jury could find that Watts Guerra was bound by Homolka's promise as apparent agent to pay Lundstrom $50,000 for the truck, if the jury found Lundstrom was not paid.

The third alleged broken promise is that Lundstrom is owed a $3.4 million bonus for his efforts as a nonlawyer consultant to plaintiffs' attorneys seeking to acquire additional claimants in their mass tort litigation. Homolka as a referring attorney could agree to pay his consultants a bonus from whatever fee Homolka was awarded if the litigation was successful. But Watts testified that Watts Guerra as the lead law firm paying these noncompensable front end expenses would never promise an unconditional bonus to a nonlawyer consultant. In any event, there is an easy answer to this issue -- the verdict makes it clear that the jury found the oral contract did *not* include a non-discretionary bonus term. Thus, neither Homolka P.A. as agent nor Watts Guerra as principal was held liable on this separate contract claim.

Viewing the evidence in the light most favorable to the verdict, we agree with the district court that the jury reasonably found Watts Guerra liable on an ostensible agency theory for Homolka's breaches of contract underlying the jury's award of $175,000 in compensatory damages.

**B. Denial of a New Trial.** Lundstrom cross appeals the district court's denial of his motion for a new trial either limited to damages, or a new trial as to all issues

because the jury reached a compromise verdict. We review a district court's denial of a motion for a new trial for abuse of discretion, applying state law in a diversity case to determine whether the verdict is against the weight of the evidence. See PFS Distrib. Co. v. Raduechel, 574 F.3d 580, 589 (8th Cir. 2009). Under South Dakota law, the verdict is given "significant deference" and a damages award should be overturned only in "extreme cases." Excel Underground, Inc. v. Brant Lake Sanitary Dist., 941 N.W.2d 791, 804 (S.D. 2020) (quotation omitted). An impermissible compromise verdict occurs if "the jury, unable to agree on the issue of liability, compromises that disagreement by awarding a party inadequate damages." Boesing v. Spiess, 540 F.3d 886, 889 (8th Cir. 2008). Our cases reflect, without discussing the issue, that this determination by the district court is a question of federal law. See Bavlsik v. Gen. Motors, LLC, 870 F.3d 800, 809 (8th Cir. 2017).

Lundstrom argues that the jury's damages award is inadequate because, "[o]nce the jury concluded Homolka committed a breach, there is nothing the jury could have relied upon in order to arrive at a compensatory figure of $175,000" -- either Lundstrom was entitled to $240,000 because Homolka agreed to pay $10,000 per month "until settlement," or to $290,000 if the jury also found he was not paid $50,000 for the truck. Alternatively, he argues a new trial is necessary on all issues because it was a compromise verdict -- liability issues were close, and the parties agreed that if Lundstrom prevailed on his claims he was entitled to $10,000 per month until settlement, $50,000 for the truck, and a bonus of $3.4 million.

As the district court recognized in denying a new trial, Lundstrom's arguments turn on his assumption that the jury in finding one or more breaches of contract must be deemed to have found breaches of the contract as Lundstrom defined it. At trial, the parties vigorously debated when the $10,000 per month leasing payments were to end, whether Lundstrom had been paid for the truck, and whether the alleged oral contract included a nondiscretionary bonus. Jury Instruction No. 10 only stated the damage figures "Plaintiff has asserted." The verdict form did not direct the jury to

find which of the alleged "broken promises" were a breach of contract. They were asked to find if the oral contract was breached and if so, what compensatory damages should be awarded. We agree with the district court that proper deference to the jury verdict demands that it not be interpreted in the self-serving manner Lundstrom urges:

> Because the jury heard conflicting testimony on whether the $3.4 million bonus was discretionary, when the web-leasing payments were to end, the reimbursement of the truck, as well as accusations of padding the bills, the jury was within its province to believe some of Lundstrom's evidence and find the $175,000 award adequate for those breaches of contract that did occur, measured against how long any breach may have lasted.

Lundstrom v. Homolka, et al., No. 1:19-CV-01006-CBK, 2022 WL 458432, at *7 (D.S.D. Feb. 15, 2022). Based on its participation in the entire trial, the district court concluded that "the jury likely found the three culpable defendants did breach their oral contract with Mr. Lundstrom, but only regarding the truck reimbursement and the monthly web-leasing payments, but not for as long as asserted by the plaintiff." Id. at *5. After careful study of the trial record, we agree.

In addition, we agree with the district court there is an obvious basis for the jury's $175,000 compensatory damage award. Plaintiff's Exhibits 53 and 54 are an invoice Lundstrom emailed to Homolka on May 20, 2017. It sets forth a series of expenses including $50,000 for truck reimbursement and subtracts "wires" and "advertising receipts" totaling $89,375, leaving a total owing to Lundstrom of $175,125. As the district court noted, "It is not a leap of the imagination to logically conclude this invoice is the anchor for the jury's verdict." Id. at *5.

In considering these issues, "we start with the assumption jurors fulfilled their obligation to decide the case correctly," and "we defer second to the trial court which has a far better sense of what the jury likely was thinking and also whether there is

any injustice in allowing the verdict to stand." <u>Bavlsik</u>, 870 F.3d at 810 (cleaned up). Applying these deferential standards, we have no difficulty concluding the district court did not abuse its discretion in denying Lundstrom's motion for a new trial. The jury verdict awarding $175,000 compensatory damages was neither inadequate nor the product of an inappropriate compromise.

The judgment of the district court is affirmed.

_____