# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2747

_____

Ecclesiastical Denzel Washington, also known as Willie Simmons

*Plaintiff - Appellee*

v.

Larry Denney, Warden

*Defendant - Appellant*

Terry Page, Deputy Warden; Chris McBee, Deputy Warden; Todd Warren,
Assistant Warden; Lauretta Aitkens, Chief of Custody

*Defendant*s

Ronda Pash, Deputy Warden

*Defendant - Appellant*

Kimberly Herring, F.U.M.

*Defendant*

Cyndi Prudden, Deputy Division Director

*Defendant - Appellant*

Shawn D. Huff, C.O.II; Shawn Pettigrew, C.C.W.; Judy Huff, C.C.W.; Brian
Montgomery; Mr. White

*Defendant*s

Mrs. Richey

*Defendant - Appellant*

Sliver, C.O. II; Mrs. McDonnal; Steven Nibarger; Mr. Green; Deron Neu; Brent Jestes; Mrs. Parkhurst

*Defendant*s

————————

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

————————

Submitted: April 12, 2018
Filed: August 13, 2018

————————

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

————————

SMITH, Chief Judge.

Ecclesiastical Denzel Washington brought suit against Larry Denney, Ronda Pash, Cynthia Prudden, and Cheryl Richey, corrections officials (collectively, "corrections officials") at Crossroads Correctional Center ("Crossroads"), for violation of his Eighth Amendment rights under 42 U.S.C. § 1983. Specifically, he alleged that these officials were deliberately indifferent to his serious medical need by failing to take reasonable steps to abate the risk of harm that secondhand smoke poses to him. He alleged that his long history of asthma and other respiratory conditions exacerbates these risks. The jury found in Washington's favor and awarded him $40,000 in compensatory damages and imposed a total of $71,000 in punitive damages as follows: $20,000 against Denney; $25,000 against Pash; $25,000

-2-

against Prudden; and $1,000 against Richey. The officials appeal, arguing that (1) Washington failed to offer sufficient evidence to prove that they violated his clearly established Eighth Amendment rights and, therefore, they are entitled to qualified immunity; and (2) punitive damages were improper because Washington failed to show that they were motivated by evil motive or intent or showed callous indifference to his Eighth Amendment rights.

We hold that sufficient evidence exists that the officials violated Washington's Eighth Amendment rights, but we conclude that insufficient evidence justifies an award of punitive damages. Accordingly, we affirm the jury's finding that the officials were deliberately indifferent to Washington's serious medical need by failing to take reasonable steps to abate the risk of harm that secondhand smoke poses to him. We vacate the award of punitive damages and remand for further proceedings consistent with this opinion.

## I. *Background*

"We recite the facts in the light most favorable to the jury's verdict." *United States v. Payne-Owens*, 845 F.3d 868, 870 n.2 (8th Cir. 2017) (quoting *United States v. Stevens*, 439 F.3d 983, 986 (8th Cir. 2006)).

Washington "suffers from chronic asthma and bronchitis." Transcript of Jury Trial, Vol. II, at 340–41, *Washington v. Denney*, No. 5:14-cv-06118-NKL (W.D. Mo. Apr. 11, 2017), ECF No. 184. His "asthmatic attacks are very painful" and are preceded by wheezing, chest pains, and coughing. Transcript of Jury Trial, Vol. I, at 37, *Washington v. Denney*, No. 5:14-cv-06118-NKL (W.D. Mo. Apr. 10, 2017), ECF No. 183. These attacks are more frequent when Washington is exposed to tobacco smoke.

-3-

In 2010, Washington was transferred to Crossroads. At that time, Denney was Crossroads's warden, Pash was Crossroads's deputy warden,[1] Prudden was the Missouri Department of Corrections Deputy Director for the Division of Adult Institutions,[2] and Richey was Washington's case manager.

Over 85 percent of prisoners at Crossroads smoke. The Missouri Department of Corrections has a smoking policy that prohibits smoking in any building and within 25 feet from any entryway, which applies to Crossroads. Staff and offenders have designated areas in which they smoke outside at Crossroads; those designated areas are the recreational yards for offenders and the walkways for staff. Crossroads also has offender rules consistent with the smoking policy. While "sometimes the smoking policy is enforced," Transcript of Jury Trial, Vol. I, at 46, the "policy is routinely violated," Transcript of Jury Trial, Vol. II, at 286. Prisoners are confined to their cells for 18 to 21 hours per day, and Crossroads allows prisoners to keep cigarettes, tobacco, rolling papers, rolling machines, and lighters in their cells. Corrections officers "can smell smoke all the time" in housing units. *Id.*

Shortly after Washington arrived at Crossroads, the medical staff enrolled him in the asthma chronic care clinic. His treatments included nebulizers and inhalers. They also included "lay-ins," which are nonpharmaceutical prescriptions that doctors at Crossroads order. Washington's lay-ins required that he be housed with nonsmoking roommates and given a painter's mask to protect him from smoke. Despite Washington's treatments and lay-ins, secondhand smoke continued to cause Washington to suffer asthma symptoms and attacks.

Washington sent letters to Denney, Pash, and Richey to alert them of the smoking in Crossroads's housing units. He also raised the issue to Denney and

---

[1]Pash became Crossroads's warden upon Denney's retirement.

[2]Prudden still holds this position.

Richey verbally. When Denney, Pash, and Richey ignored him, Washington began filing informal resolution requests (IRRs), the first step in Crossroads's grievance procedure. On March 13, 2014, Washington filed an IRR "about [how] the staff was not enforcing the no-smoking policy" or following the doctors' orders. Transcript of Jury Trial, Vol. I, at 53. Washington complained that his cellmate was smoking in the cell. He also described how he had suffered an asthmatic attack from exposure to the secondhand smoke and explained "that the secondhand smoke was still repeatedly recycled, coming through the ventilation system." *Id.* at 55. Washington directed the IRR to Denney, Page, and Pash. When Washington's IRR was denied, he appealed by filing a grievance. Denney denied the grievance, stating, "Your allegation of tobacco limitation restrictions not being enforced has been refuted and found to be without merit." Transcript of Jury Trial, Vol. II, at 231. Washington appealed Denney's decision to Prudden, but she denied the appeal.

On May 28, 2014, Washington filed a second IRR after corrections officers took away the mask that doctors had prescribed Washington to reduce his smoke exposure. Washington's IRR was denied, and he appealed to Denney. Denney did not dispute the medical staff's orders or that the mask had been taken, but he found "no evidence to substantiate [Washington's] claim" that he was "denied medical care as a result of not being allowed to possess a face mask to protect [himself] from secondhand tobacco smoke." Transcript of Jury Trial, Vol. II, at 251–52. Denney explained, "On May 29, 2014, you submitted a request for reasonable accommodation form requesting to be issued a face mask. It has been determined that a face mask . . . is not a necessity, and you shall not be allowed to possess the same." *Id.* at 252. Denney recited that tobacco use is prohibited in the housing units and advised Washington, "Should you observe anyone violating this policy, I recommend that you report it immediately to a staff member." *Id.* Washington appealed Denney's decision to Prudden, who denied it. Prudden advised Washington that he did not "need the face mask because CRCC is a nonsmoking environment," stating that the "housing units at CRCC are considered a nonsmoking environment. CRCC staff will make every

effort to ensure that Policy D2-11.9, Tobacco Use Limitations, is adhered to, and staff will issue conduct violations to an offender if he is caught smoking in the housing unit. This should resolve your complaint." *Id.* at 304.

On May 5, 2015, Washington filed an IRR asking to be transferred to another cell because his cellmate smoked. Medical staff had ordered that he have a nonsmoking cellmate to protect him from secondhand smoke. Despite the order, Washington was consistently housed with smokers. When Washington told this cellmate he had asthma and was "allergic" to secondhand smoke, the cellmate wrote a letter to Page, telling Page that he smoked. Washington and the cellmate spoke with a caseworker, who replied that the issue would be resolved. When asked if the "IRR was then handled, and [Washington's cellmate] was moved," Washington responded that "this IRR wasn't handled because [he] had to go back and file another one to medical because [he] had an asthmatic attack, and [the cellmate] was still in the cell and smoking." Transcript of Jury Trial, Vol. I, at 62. According to Washington, he "had to file another [IRR] to request that they move him from the cell." *Id.*

On May 11, 2015, Washington filed another IRR requesting a nonsmoking cellmate. Washington again referred to the medical staff's order that he be housed with a nonsmoker. The responding officer informed Washington that the medical staff's orders requiring him to have a nonsmoking cellmate were "discontinued, as Crossroads Correctional Center is a nonsmoking facility." *Id.* at 80. Washington appealed by filing a grievance, but his grievance was denied.

On June 17, 2015, Washington filed yet another IRR asking to be housed with a nonsmoking cellmate. Because his lay-in for a nonsmoking cellmate was discontinued, his IRR was denied. The responding officer found that Washington's "medical need ha[s] been met." Transcript of Jury Trial, Vol. II, at 275. Washington's grievance and appeal were also denied.

On December 1, 2015, Washington filed an IRR asking Crossroads to move the facility's designated smoking area away from the medical clinic. He complained that the walkway leading to the clinic's door required him to pass smokers on his way to get breathing treatments. After his IRR was denied, Washington filed a grievance detailing his concerns and their effects on this asthma. Pash denied the grievance because she found that the designated smoking area conformed to Crossroads's smoking policy. Washington appealed to Prudden. Prudden denied the appeal, explaining that the response that Washington received "adequately addressed [his] complaint" and stating that "[t]he staff smoking area is appropriately located 25 feet from the entrance to the medical unit." *Id.* at 307. According to Prudden, Washington "failed to provide any additional evidence to support [his] claim." *Id.*

Washington brought suit against the corrections officials for violation of his Eighth Amendment rights under 42 U.S.C. § 1983. Specifically, he alleged that these officials were deliberately indifferent to his serious medical need by failing to take reasonable steps to abate the risk of harm that secondhand smoke poses to him. He alleged that his long history of asthma and other respiratory conditions exacerbates these risks. The corrections officials moved for summary judgment, arguing that they were entitled to qualified immunity because no evidence existed that the corrections officials were deliberately indifferent to Washington's conditions of confinement. The district court denied the motion.

The case proceeded to trial. After the close of Washington's case-in-chief, the corrections officials moved for judgment as a matter of law (JML). *See* Fed. R. Civ. P. 50(a)(1). They did not reassert qualified immunity, but instead argued that Washington failed to present sufficient evidence that they acted with deliberate indifference in failing to take reasonable measures to abate the risk of injury to Washington from secondhand smoke. They also contended that Washington failed to present sufficient evidence that he suffered harm as a direct result of their alleged failure. After the defense rested, they again moved for judgment as a matter of law on

the same grounds. *See id.* Again, the motion did not mention qualified immunity. The district court took the corrections officials' motion under advisement.

The jury found in Washington's favor and awarded $40,000 in compensatory damages and imposed a total of $71,000 in punitive damages as follows: $20,000 against Denney; $25,000 against Pash; $25,000 against Prudden; and $1,000 against Richey. The district court entered judgment consistent with the jury's verdict. The corrections officials then renewed their motion for judgment as a matter of law and moved for a new trial. *See* Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59. In addition to raising the arguments previously made in their Rule 50(a) motions, the corrections officials also argued that Washington failed to present sufficient evidence of outrageous, intentional, or malicious conduct to justify submission of a jury instruction for punitive damages to the jury. The corrections officials did not mention qualified immunity in their motion or opening brief. Instead, in their reply brief in support of their motion, they asserted for the first time that they did not violate Washington's clearly established constitutional rights.

The district court denied the corrections officials' Rule 50(b) and Rule 59 motions. The district court found that Washington sufficiently proved that he suffered from an objectively serious medical need and that the corrections officials knew of the need but deliberately disregarded it. The court also concluded that sufficient evidence supported the punitive damages award. The court declined to consider the corrections' officials argument that they did not violate Washington's clearly established rights because they did not raise qualified immunity in their opening brief.

## II. *Discussion*

The corrections officials appeal, arguing that (1) they are entitled to qualified immunity because Washington failed to offer sufficient evidence to prove that they violated his clearly established Eighth Amendment rights to be free from deliberate indifference to his serious medical need; and (2) punitive damages were improper

because Washington failed to show that they were motivated by evil motive or intent or callous indifference to his Eighth Amendment rights.

"We review *de novo* a district court's denial of a motion for judgment as a matter of law, viewing the evidence in the light most favorable to the verdict. We review a motion for a new trial for abuse of discretion." *Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 552 (8th Cir. 2017) (quoting *Barkley, Inc. v. Gabriel Bros., Inc.*, 829 F.3d 1030, 1042 (8th Cir. 2016)).

"[T]he law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017) (alteration in original) (quoting *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002)), *cert. denied*, 138 S. Ct. 1991 (2018). We are hesitant "to interfere with a jury verdict," as reflected in the "analysis for considering renewed JML motions." *Id.* The applicable standard provides:

> In ruling on a motion for [judgment as a matter of law], the district court must (1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved. That done, the court must then deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence.

*Haynes v. Bee-Line Trucking Co.*, 80 F.3d 1235, 1238 (8th Cir. 1996) (alteration in original) (quoting *TEC Floor Corp. v. Wal–Mart Stores*, 4 F.3d 599, 601 (8th Cir. 1993)).

## A. *Deliberate Indifference*

The corrections officials' appellate brief makes the same substantive argument as their Rule 50(a) and 50(b) motions—Washington failed to present sufficient evidence that they acted with deliberate indifference in failing to take reasonable measures to abate the risk of injury to Washington from secondhand smoke.[3]

---

[3]The corrections officials initially phrase their argument in their opening brief as one of qualified immunity: that they "were entitled to judgment as a matter of law on Washington's claims under 42 U.S.C. § 1983, which alleged violations of the Eighth Amendment, because they had qualified immunity, in that Washington failed to prove that these corrections employees violated his clearly established constitutional rights." Appellants' Br. at 12. "But a party seeking a qualified-immunity defense must continue to urge it during and after trial in order to avoid forfeiting the argument on appeal." *Ayers v. City of Cleveland*, 773 F.3d 161, 167 (6th Cir. 2014) (citing *Ortiz v. Jordan*, 562 U.S. 180, 185 (2011)). The record shows that but for a contention in their reply brief to their Rule 50(b) motion that they "did not violate Plaintiff's clearly established constitutional rights," Reply Suggestions at 2, *Washington v. Denney et al.*, No. 5:14-cv-06118-NKL (W.D. Mo. June 5, 2017), ECF No. 192, the corrections officials never renewed their qualified-immunity argument.

We acknowledge that the Supreme Court "left open the possibility that a 'qualified immunity plea raising an issue of a purely legal nature' may be 'preserved for appeal by an unsuccessful motion for summary judgment, and need not be brought up again under Rule 50(b).'" *Plascencia v. Taylor*, 514 F. App'x 711, 719 (10th Cir. 2013) (quoting *Ortiz*, 562 U.S. at 189). Here, the corrections "officials' claims of qualified immunity hardly present 'purely legal' issues capable of resolution 'with reference only to undisputed facts.' Cases fitting that bill typically involve contests not about what occurred, or why an action was taken or omitted, but disputes about the substance and clarity of pre-existing law." *Ortiz*, 562 U.S. at 189 (citations omitted). Accordingly, we decline to address the corrections officials' argument to the extent they claim they are entitled to qualified immunity.

To prove deliberate indifference, Washington had to show that he suffered from an objectively serious medical need and that the corrections officials "acted with a 'sufficiently culpable state of mind,' namely, that they actually knew of, but deliberately disregarded, [his] medical need[]." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The corrections officials do not dispute that Washington has an objectively serious medical need to be kept free from exposure to secondhand smoke; instead, they argue that they lacked culpable states of mind and responded reasonably to the substantial risk of harm to Washington.[4]

To satisfy the subjective prong, Washington had to prove that the corrections officials "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Id.* (citations omitted). It is a question of fact "[w]hether a prison official had the requisite knowledge of a substantial risk"; this may be proven through circumstantial evidence, "including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citations omitted). "It is not enough merely to find that a reasonable person would have known [about the risk], or that the defendant should have known . . . ." *Id.* at 843 n.8. "While . . . deliberate indifference entails something more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. "[A] prison official cannot be found liable under the Eighth Amendment for denying an

---

[4]At trial, the parties stipulated that "Washington's medical records indicate he suffers from chronic asthma and bronchitis." Transcript of Jury Trial, Vol. II, at 340–41. They also stipulated that "[s]econdhand smoke is known to cause health risks, especially among people with asthma and other breathing difficulties." *Id.* at 341.

inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. This means that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* An official's inadequate "response to a risk may support an inference that the offic[ial] recognized the inappropriateness of his conduct." *Krout*, 583 F.3d at 567.

But "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. "[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845. But "[i]t does not follow . . . that an unreasonable response—i.e., a negligent response—is sufficient to establish liability." *Krout*, 583 F.3d at 567. "The plaintiff must show that the officers were deliberately indifferent in their response to the perceived risk." *Id.* at 568 (citation omitted).

The corrections officials concede they "were aware that Washington claimed that he had asthma" and that he claimed he "had cellmates smoking in his cell, which exacerbated that condition." Appellants' Br. at 16. But they argue that Washington failed to prove that they drew an inference that a substantial risk of serious harm existed to Washington based on these facts. First, they assert they changed Washington's cellmate on two occasions in response to his grievances. Second, they contend that "Prudden and Denney denied Washington's grievance related to the surgical mask because prison staff determined it was a security issue and medical" personnel determined it unnecessary. *Id.* at 16–17 (citing Transcript of Jury Trial, Vol. II, at 315 ("Masks determined to be custody risk and were removed from patient's possession by custody. Patient educated. Medical director discussed and determined to not be necessary.")). Third, they maintain that when Richey discussed an IRR with Washington, she informed him that he could find a nonsmoking cellmate

who would agree to cell with him. She also advised him to report any violations of the smoking policy to custody staff so staff could write a violation. They maintain that while Richey could do cell assignments, she rarely did, and no evidence exists that she assigned any of the smoking cellmates to Washington's cell. Fourth, the corrections officials note that none of them prevented Washington from receiving medical care, including his medication and breathing treatments. Finally, while they acknowledge that Washington asked them to change the smoking policy to ban tobacco products at Crossroads, the corrections officials argue that Washington failed to prove they could do so. They contend they could only enforce the existing policy, direct their subordinates to enforce the policy, and direct the offenders to follow the policy.

In light of the "high standard on overturning a jury verdict," we conclude that "legally sufficient evidence . . . support[s] the jury's liability finding." *Bavlsik*, 870 F.3d at 805 (citation omitted). First, sufficient evidence supports the jury's finding that Denney was deliberately indifferent to Washington's serious medical need. Washington proved that Denney knew of the serious risk tobacco smoke posed to Washington's health. Denney testified that he knew Washington has asthma and chronic bronchitis. He confirmed that Washington "has been vocal with staff of Crossroads about the secondhand smoke that goes on." Transcript of Jury Trial, Vol. II, at 240. He also stipulated knowing that "Washington required a nonsmoking cellmate as part of his medical treatment plan since at least as early as 2010." *Id.* at 342. Washington testified he alerted Denney to the smoking problem at Crossroads both verbally and via letter prior to filing his IRRs. He then filed at least three grievances with Denney in which Washington attributed his asthmatic attacks to secondhand smoke. Denney admitted reviewing these grievances.

Sufficient evidence also exists that Denney disregarded the risk that secondhand smoke poses to Washington's health. For instance, Washington

-13-

complained about a cellmate smoking in his cell, described how he had suffered an asthmatic attack from exposure to secondhand smoke, and explained that the secondhand smoke was being recycled through the ventilation system. Denney denied Washington's grievance as "without merit," despite admitting that prisoners did smoke in their cells and corrections officers violated the smoking policy. Denney admitted he never conducted "any tests to determine the levels of environmental tobacco smoke in the housing units" to verify Washington's complaint. *Id.* at 225. Despite acknowledging he "developed the standard operating procedures based upon the departmental guidelines," Denney testified that he did not recall ever considering the possibility of "provid[ing] matches or lighters near the receptacles outside" instead of permitting "prisoners to have lighters in their cells." *Id.* at 225, 240. Denney admitted having access to Washington's lay-ins for a nonsmoking cellmate but still permitting Washington to be housed with offenders who were known smokers.

Second, sufficient evidence supports the jury's finding that Pash was deliberately indifferent to Washington's serious medical need. As with Denney, Washington proved that Pash knew secondhand smoke was a serious risk to Washington's health. Pash testified that she knew Washington had been treated for asthma. Pash admitted knowing that Washington had "filed grievances about the indoor smoking that goes on at Crossroads" and that "Washington ha[d] been vocal about his concerns about secondhand smoke at Crossroads." Transcript of Jury Trial, Vol. I, at 139, 148–49. Washington testified he alerted Pash to the smoking problem at Crossroads via letter prior to filing his IRRs. Through the grievance process, Washington informed Pash that the ventilation system circulated secondhand smoke through the housing units. His grievances also asserted staff was ignoring his lay-in for a nonsmoking cellmate. In addition, his grievances informed Pash that the smoking areas' proximity to the medical facility prevented him from avoiding secondhand smoke. Pash's signature appears on the grievance form immediately

-14-

below Washington's handwritten notes linking secondhand smoke at Crossroads to his asthmatic attacks.

As with Denney, sufficient evidence exists that Pash disregarded the risk that secondhand smoke poses to Washington's health. Pash admitted receiving violations stating that prisoners smoke in their cells yet never conducting "any studies [on] whether environmental tobacco smoke exists in the housing units at Crossroads." *Id.* at 129. She admitted knowing that "Washington had a lay-in and restriction for a no-smoking roommate from September 12, 2014, to September 12, 2015," but she acknowledged that Washington was regularly celled with prisoners who violated the smoking policy. *Id.* at 141. She acknowledged "prisoners are allowed to have lighters and cigarettes in their possession at Crossroads" and "in their cells." *Id.* at 131. When asked whether she could "change the policy," she replied, "I could try to pilot something, I guess." *Id.* Pash admitted she denied all of Washington's grievances, referring him to the smoking policy.

Third, sufficient evidence supports the jury's finding that Prudden was deliberately indifferent to Washington's serious medical need. Washington proved that Prudden knew secondhand smoke was a serious risk to Washington's health. Prudden reviewed and responded to at least three grievance appeals that Washington filed concerning secondhand smoke at Crossroads. She admitted that Washington generally claimed in these grievance appeals that "his asthma was exacerbated by offenders smoking" indoors. Transcript of Jury Trial, Vol. II, at 302. Prudden acknowledged in her disposition of Washington's grievance appeal that Washington was "claim[ing] that the custody staff has failed to enforce the ban on tobacco usage in state buildings." *Id.* at 293. In another disposition, Prudden acknowledged Washington's claim that he was "not being permitted by custody staff to have a face mask that was approved by medical" to "protect against the tobacco smoke" in his housing unit. *Id.* at 301.

-15-

Washington also produced sufficient evidence that Prudden disregarded the risk that secondhand smoke poses to Washington's health. Prudden denied each of Washington's grievance appeals. Prudden testified that although she investigates some of the grievance appeals on which she rules, she did not investigate any of Washington's grievance appeals. Despite not contacting anyone at Crossroads to inquire about Washington's conditions, Prudden disposed of Washington's appeal on one occasion by reciting that Crossroads is a "nonsmoking environment" with a tobacco-use limitations policy in place that "should resolve [his] complaint." *Id.* at 304.

Finally, sufficient evidence supports the jury's finding that Richey was deliberately indifferent to Washington's serious medical need. Washington proved that Richey knew secondhand smoke was a serious risk to Washington's health. Washington testified he alerted Richey to the smoking problem at Crossroads via letter prior to filing his IRRs. Richey admitted knowing that Washington needed to be kept away from tobacco smoke and knowing that Crossroads's medical staff had ordered a lay-in for Washington to be assigned a nonsmoking cellmate. She acknowledged a conversation with Washington in which he asked her to move him to a different cell with a nonsmoking cellmate and their discussion of Washington's IRR in which he complained of prisoners smoking in their cells.

The jury also had sufficient evidence from which it could reasonably conclude that Richey disregarded the risk that secondhand smoke poses to Washington's health. Richey admitted that she was responsible for assigning Washington's cellmates. Transcript of Jury Trial, Vol. III, at 382, *Washington v. Denney*, No. 5:14-cv-06118-NKL (W.D. Mo. Apr. 12, 2017), ECF No. 185 ("That fell under my job duties. I did not do a lot of those, but yes, ultimately I could determine where an offender was assigned and moved."). Part of Richey's job duties involved cell assignments when medical placed a "bunk restriction" on an offender. *Id.* Despite

Washington's lay-in requiring a nonsmoking cellmate, Richey told Washington upon his request for a nonsmoking cellmate that Crossroads "do[esn]'t track whether an offender smokes or not." *Id.* at 383. But Washington produced an exhibit of violation reports documenting who had violated the smoking policy. These violation reports are accessible to "most staff" by running a query. Transcript of Jury Trial, Vol. I, at 143.

## B. *Punitive Damages*

The corrections officials also argue that insufficient evidence supports the jury's award of punitive damages because Washington failed to show that their conduct was motivated by an evil motive or intent or involved reckless or callous indifference to Washington's Eighth Amendment rights.[5]

---

[5]The corrections officials do not challenge the jury instruction on punitive damages. Jury Instruction No. 24 provided, in relevant part:

> In determining whether to award punitive damages, you should consider whether the defendant's conduct was reprehensible. In this regard, you may consider whether the harm suffered by the plaintiff was physical or economic or both; whether there was intentional malice or reckless disregard for human health or safety; whether the defendant's conduct that harmed the plaintiff also caused harm or posed a risk of harm to others; and whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed the plaintiff.

> If you decide to award punitive damages, you should consider the following in deciding the amount of punitive damages to award:

> 1. How much harm the defendant's wrongful conduct caused the plaintiff. You may not consider harm to others in deciding the amount of punitive damages to award.

"In a § 1983 case, both compensatory and punitive damages are available upon proper proof." *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997) (citation omitted). While an award of compensatory damages is mandatory upon a finding of liability, "punitive damages are awarded or rejected in a particular case at the discretion of the fact finder once sufficiently serious misconduct by the defendant is shown." *Id.* (citations omitted). The purpose of a punitive damages award is "to 'punish the defendant for his [or her] willful or malicious conduct and to deter others from similar behavior.'" *Id.* (alteration in original) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n.9 (1986)). The factfinder focuses on the defendant's intent in determining whether to award punitive damages "and whether the defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards." *Id.* (citation omitted).

In *Coleman*, we set forth the standard for awarding punitive damages in deliberate-indifference cases, applying the § 1983 punitive damages standard:

2. What amount of punitive damages, in addition to the other damages already awarded, is needed, considering the defendant's financial condition, to punish the defendant for his wrongful conduct toward the plaintiff and to deter the defendant and others from similar wrongful conduct in the future;

The amount of any punitive damages award should bear a reasonable relationship to the harm caused to the plaintiff.

You may assess punitive damages against any or all defendants or you may refuse to impose punitive damages. If punitive damages are assessed against more than one defendant, the amounts assessed against such defendants may be the same or they may be different.

Jury Instructions at 26–27, *Washington v. Denney*, No. 5:15-cv-06118-NKL (W.D. Mo. Apr. 12, 2017), ECF No. 167.

"[W]hen the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* (quoting *Walters v. Grossheim*, 990 F.2d 381, 385 (8th Cir. 1993)).[6] "Punitive damages punish a defendant for outrageous, intentional, or malicious conduct, and deter similar extreme conduct in the future." *Schaub v. VonWald*, 638 F.3d 905, 922–23 (8th Cir. 2011) (citing *Smith v. Wade*, 461 U.S. 30, 54 (1983); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67 (1981)). "A finding of deliberate indifference to a serious medical need, while establishing liability under § 1983, does not necessitate a finding of callous indifference warranting punitive damages." *Coleman*, 114 F.3d at 787 (citing *Standley v. Chilhowee R–IV Sch. Dist.*, 5 F.3d 319, 323 (8th Cir. 1993) (holding defendant was liable under § 1983 for violating plaintiff's First Amendment rights, but concluding there was insufficient evidence that defendant's conduct rose to the level of "evil motive" or "reckless or callous indifference" to justify punitive damages); *Cornell v. Woods*, 69 F.3d 1383, 1391 (8th Cir. 1995) (holding prison officials' conduct in punishing inmate for

_____

[6]In *Coleman*, we did not discuss *Farmer*'s rejection of deliberate indifference as equating with civil-law recklessness. *See Farmer*, 511 U.S. at 837. *Farmer* "adopted an approach consistent with the recklessness in the criminal law." *Id.* As a result, *Farmer* held that to be liable for deliberate indifference of a serious medical need, a prison official must "know[] of and disregard[] an excessive risk to inmate health and safety." *Id.* Our court's use of the ordinary § 1983 punitive damages standard of "reckless or callous indifference" in *Coleman* would permit a punitive damages awards against prison officials under a standard that is *less harsh* than the deliberate indifference standard under which they were adjudicated liable. However, we need not resolve this legal issue in the present case. First, the corrections officials have not objected to application of the ordinarily applicable § 1983 punitive damages standard and, in fact, quote that standard in their brief. *See* Appellants' Br. at 19 (citing *Schaub*, 638 F.3d 905, 922 (8th Cir. 2011). Second, in *Schaub*, we clarify that the defendant's conduct must be "outrageous, intentional, or malicious" to warrant imposition of punitive damages. *Schaub*, 638 F.3d at 922.

exercising his First Amendment rights established liability under § 1983 but did not warrant imposition of punitive damages); *Ivey v. Wilson*, 832 F.2d 950, 956 (6th Cir. 1987) (holding prison officials' acts violated prisoner's due process rights and gave rise to § 1983 liability, but punitive damages award was improper because there was no evidence that defendants "were acting in bad faith" or "harbored any ill will" towards plaintiff); *Walters v. City of Atlanta*, 803 F.2d 1135, 1147 (11th Cir. 1986) (upholding jury's finding that "defendants were responsible for the racial discrimination" plaintiff suffered, but vacating punitive damages award because the record did not show that defendants "acted with either the requisite ill will or callous disregard of [plaintiff's] federally protected rights"); *Lavicky v. Burnett*, 758 F.2d 468, 477 (10th Cir. 1985) (holding unlawful search and seizure and taking of plaintiff's property without a hearing gave rise to § 1983 liability, but concluding punitive damages award was properly set aside because "there was no evidence of malice, wantonness, or oppressiveness"); *Soderbeck v. Burnett Cty.*, 752 F.2d 285, 289 (7th Cir. 1985) (holding plaintiff's showing of political dismissal was sufficient for compensatory damages, but not punitive damages); *Hernandez–Tirado v. Artau*, 874 F.2d 866, 872 (1st Cir. 1989) (same)).

*Coleman* upheld a compensatory damages award for deliberate indifference to an inmate's serious medical need against a prison nurse. *Id.* The damage award compensated the inmate for the physical pain and mental anguish she experienced resulting from the nurse's two-hour delay in transferring the inmate to the hospital for the premature delivery of the inmate's child, despite the nurse's contention that the inmate would have experienced the same labor in the hospital. *Id.* But we held that the district court abused its discretion in awarding punitive damages and vacated the district court's punitive damages award to the inmate after reviewing the trial evidence, holding that the nurse's conduct "was not sufficiently egregious to justify the imposition of punitive damages." *Id.* at 788 (citation omitted). This was because the nurse had "relied on, and attempted to follow, the University physicians'

instructions in caring for [the inmate]." *Id.* (citation omitted). We determined that the nurse's conduct did not "rise to the level calling for punishment and deterrence over and above that provided by the compensatory award." *Id.* (citing *Smith*, 461 U.S. at 54; *Stachura*, 477 U.S. at 310 ("Section 1983 presupposes that damages that compensate for actual harm ordinarily suffice to deter constitutional violations.")).

Having reviewed the trial evidence, we conclude that Washington presented no evidence that the corrections officials' actions were "outrageous, intentional, or malicious" to justify imposition of a punitive damages award. *See Schaub*, 638 F.3d at 922. Like the nurse in *Coleman*, the corrections officials did "rel[y] on" the existing smoking policy, which prohibits smoking indoors. *See* 114 F.3d at 788. With regard to Richey, Washington offered no evidence that Richey intentionally assigned him a smoking cellmate; instead, he testified that he had both smoking and nonsmoking cellmates. Prudden, Pash, and Denney all were supervisors who only reviewed Washington's grievance appeals—Washington has not identified any conduct that they engaged in toward him beyond their review and denial of those appeals. "The facts of this case illustrate the difference between conduct justifying mere liability under the Eighth Amendment and conduct justifying punitive damages under § 1983." *Id.*

### III. *Conclusion*

Accordingly, we affirm the jury's finding that the officials were deliberately indifferent to Washington's serious medical need by failing to take reasonable steps to abate the risk of harm that secondhand smoke poses to him. We vacate the award of punitive damages and remand for further proceedings consistent with this opinion.

_____