# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2067
_____

Janice Hargrove Warren

*Plaintiff - Appellee*

v.

Mike Kemp, in his official capacity as a Member of the Board of the Pulaski County Special School District and in his individual capacity; Linda Remele, in her official capacity as a Member of the Pulaski County Special School District and in her individual capacity; Shelby Thomas, in his official capacity as a Member of the Pulaski County Special School District and in his individual capacity; Alicia Gillen, in her official capacity as a Member of the Pulaski County Special School District and in her individual capacity; Eli Keller, in his official capacity as a Member of the Pulaski County Special School District and in his individual capacity; Brian Maune, in his official capacity as a Member of the Pulaski County Special School District and in his individual capacity; Pulaski County Special School District

*Defendants - Appellants*
_____

No. 22-2169
_____

Janice Hargrove Warren

*Plaintiff - Appellant*

v.

Mike Kemp, in his official capacity as a Member of the Board of the Pulaski County Special School District and in his individual capacity; Linda Remele, in her

official capacity as a Member of the Pulaski County Special School District and in her individual capacity; Shelby Thomas, in his official capacity as a Member of the Pulaski County Special School District and in his individual capacity; Alicia Gillen, in her official capacity as a Member of the Pulaski County Special School District and in her individual capacity; Eli Keller, in his official capacity as a Member of the Pulaski County Special School District and in his individual capacity; Brian Maune, in his official capacity as a Member of the Pulaski County Special School District and in his individual capacity; Pulaski County Special School District

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central

_____

Submitted: June 15, 2023
Filed: August 22, 2023

_____

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.

_____

GRUENDER, Circuit Judge.

After being passed over for a superintendent role, Dr. Janice Warren sued her employer, Pulaski County Special School District ("PCSSD"), and its board members, for discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981. A jury found in her favor on her Title VII and § 1981 retaliation claims and awarded damages, including punitive damages. The defendants appeal the district court's denial of their motion for judgment as a matter of law and the punitive damages award. Dr. Warren cross-appeals the district court's denial of her request for front pay, additional back pay, and equitable relief. We vacate the judgment for Dr. Warren.

# I.

Dr. Warren works for PCSSD. PCSSD has been under federal court supervision since 1982 when the predominately black Little Rock School District sued the predominately white PCSSD, North Little Rock School District, as well as the state of Arkansas. We ordered the schools to develop desegregation plans to establish unitary, racially integrated districts. *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist.*, 778 F.2d 404, 434-36 (8th Cir. 1985). In 2000, the parties in that case reached an agreement (the "Plan 2000") whereby PCSSD promised it would "prepare . . . a plan so that existing school facilities are clean, safe, attractive, and equal."

In 2011, the district court found that PCSSD was not in compliance as to facilities because it had "devoted a disproportionate share of its facilities spending to predominantly white areas." *Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738, 753 (8th Cir. 2011). PCSSD then decided to build a new Mills High School in a predominantly black area and to convert Robinson High School to a middle school in a predominantly white area.

In 2012, Dr. Warren was hired to be the director of PCSSD's elementary education program. A year later, she also became the interim assistant superintendent for equity and pupil services. Then, in 2017, the PCSSD board (consisting of Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Dr. Linda Remele, Shelby Thomas, and Tina Ward), hired Dr. Warren to be the interim superintendent for one year. Her contract stated that afterward, she would return to her previous position as assistant superintendent for equity and pupil services.

At the end of August 2017, Dr. Warren was notified of significant differences between the construction of the Robinson Middle School and the Mills High School. For example, Robinson's weight room was 2,700 square feet larger than the one at Mills. And Robinson had theater-style padded seats in its basketball arena while Mills had "glorified folding chairs" in its gymnasium.

After investigating, Dr. Warren called the board members and PCSSD's attorney in the desegregation case to notify them of the differences. An upcoming status hearing in the ongoing desegregation case had already been scheduled for early September, so PCSSD's attorney updated PCSSD's status report to include information about the differences in the facilities. After the report was filed, tension developed between Dr. Warren and some of the board members. For example, some board members alleged Dr. Warren revised and submitted the status report without them seeing it, and Dr. Remele was upset about the status report being published in the newspaper.

Before Dr. Warren's interim superintendent contract expired, the board began to search for a permanent superintendent. There is conflicting evidence about whether the search began before or after the September status update. In any event, it was after the status update that the board hired Ray & Associates, a national school-executive-search organization, to help find a permanent superintendent.

Dr. Warren applied for the permanent superintendent position. Nine top candidates, including Dr. Warren, were selected for the board to review. After reviewing each candidate's video presentation and application package, each board member completed a "consensus-building matrix." Ray & Associates then ranked the candidates using the collective matrix scores, and the board chose three finalists to interview. Dr. Warren was not a finalist, though no one disputes that she was qualified for the position. Dr. Warren believes she was not a finalist because Gillen and Dr. Remele scored her very low when completing the matrix to bring her overall score down. Ultimately, the board hired someone else to be the superintendent, and Dr. Warren returned to her prior position.

After being passed over for the superintendent position, Dr. Warren sued PCSSD and the board members in their individual capacities for discrimination and retaliation under Title VII and § 1981 and for breach of contract. As to retaliation, she alleged that the defendants declined to interview or hire her because she reported the disparity in the facilities. She requested back pay, front pay, compensatory

-4-

damages, punitive damages, pre- and post-judgment interest, and other equitable relief. The defendants moved for summary judgment, arguing that Dr. Warren did not engage in protected conduct for her retaliation claims. Their motion was denied.

At trial, the defendants moved for judgment as a matter of law, raising the same purely legal questions as at summary judgment. Their motion again was denied. The jury found in Dr. Warren's favor only on her Title VII and § 1981 retaliation claims for not being hired as superintendent. For those claims, the jury instructions contained a single retaliation instruction that did not distinguish between Title VII and § 1981. The jury awarded her back pay and other compensatory damages and also punitive damages against PCSSD, Dr. Remele, and Gillen. The district court then granted the defendants' earlier motion for judgment as a matter of law as to punitive damages against PCSSD, agreeing that they are not available against political subdivisions like school districts.

Dr. Warren asked to be reinstated, for front pay, for an order to increase her salary, for pre- and post-judgment interest, and for other equitable and declaratory relief. The defendants then renewed their motion for judgment as a matter of law on the protected-conduct issue. They also moved, in the alternative, to alter or amend the judgment, arguing that punitive damages cannot be awarded against Dr. Remele and Gillen. As to Dr. Warren's motion, the district court denied her request for front pay, additional back pay, and other equitable relief, but it awarded her pre- and post-judgment interest on her lost wages and benefits. As to the defendants' motion, the district court upheld the jury's verdict and affirmed the award of punitive damages. The defendants appeal the denial of their motion for judgment as a matter of law. Dr. Warren cross-appeals, renewing her requests for increased back pay, front pay, and reinstatement.

## II.

We begin with the defendants' motion for judgment as a matter of law. We review the district court's denial *de novo*, viewing the evidence in the light most

favorable to the jury's verdict. *Wedow v. City of Kansas City*, 442 F.3d 661, 666 (8th Cir. 2006). Judgment as a matter of law is appropriate if there is no "legally sufficient evidentiary basis" for a reasonable jury to find for the non-moving party. Fed. R. Civ. P. 50(a)(1).

The jury found in Dr. Warren's favor for retaliation. Because the jury instructions did not distinguish between the Title VII and § 1981 claims, we assume that the jury found for Dr. Warren as to both.

Title VII bans discrimination with respect to "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In addition, Title VII "prevents employers from retaliating against employees who have acted to vindicate their statutorily protected rights by reporting harassment or discrimination in the workplace." *Brannum v. Mo. Dep't of Corrs.*, 518 F.3d 542, 547 (8th Cir. 2008); *see* 42 U.S.C. § 2000e-3(a).

Section 1981 provides that all persons shall have the same right to "make and enforce contracts . . . as is enjoyed by white citizens," which includes the right to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b). Section 1981 protects private employees who are discriminated against on the basis of race. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). To prove a § 1981 discrimination claim, a plaintiff must establish membership in a protected class, discriminatory intent by the defendant, engagement in a protected activity (e.g., attempting to make a contract or having an existing contractual relationship), and interference with that activity. *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468-69, 473 (8th Cir. 2009) (en banc); *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 964 (8th Cir. 2011) (noting that the plaintiffs did not attempt to make a contract or have an existing contractual relationship that constituted protected activity). It also encompasses claims of retaliation for an individual "attempting to vindicate the rights of minorities protected by § 1981." *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1031 (8th Cir.

2013); *see CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (holding that a plaintiff may bring a retaliation claim under § 1981 to vindicate the § 1981 rights of another).

To establish retaliation under either Title VII or § 1981, a plaintiff must prove (1) he engaged in statutorily protected activity, (2) suffered an adverse employment action, and (3) that the engagement in a protected activity is the but-for cause of the adverse employment action. *See Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 436 (8th Cir. 2016) (listing the elements of a Title VII retaliation claim); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997) (explaining that the elements of retaliation for Title VII and § 1981 are the same).

The defendants argue that judgment as a matter of law is appropriate because Dr. Warren's reporting of the disparity in the facilities does not qualify as a protected activity, she did not suffer an adverse employment action, and there is insufficient evidence to find that she was not hired as superintendent because she reported the disparity in the facilities. We conclude that Dr. Warren did not engage in a protected activity, so we need not reach the defendants' other arguments.

We and other courts have held that an employee engages in a protected activity under § 1981 when the employee has opposed any practice made unlawful by Title VII involving race-based discrimination. *See, e.g.*, *Sayger*, 735 F.3d at 1030-31; *Scott v. U.S. Bank Nat'l Assoc.*, 16 F.4th 1204, 1209 (5th Cir. 2021). Thus, cases interpreting opposition under Title VII are "instructive" in determining whether conduct "vindicated the rights of minorities" and is therefore protected under § 1981. *Sayger*, 735 F.3d at 1031 (brackets omitted). To be sure, protected activities under § 1981 might include conduct not also covered by Title VII because § 1981 prohibits discrimination in all contractual relationships. But the parties present this case as having a single protected-activity theory based on Title VII. There was a single jury instruction for both retaliation claims, and on appeal the defendants argue that Dr. Warren did not engage in protected conduct because she did not report a discriminatory employment practice, again treating the claims as if

-7-

they are one. Dr. Warren responds without arguing that she has separate protected-activity theories for each claim. We therefore accept the parties' invitation to treat the claims as one. So we focus on whether her conduct is protected under Title VII. If it is not, we vacate the jury's verdict in her favor on both retaliation claims.

Under Title VII, "protected activity" includes opposition to discriminatory employment practices prohibited under Title VII. *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007). Such practices are those that discriminate with respect to "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." § 2000e-2(a)(1). We have rejected Title VII retaliation claims where the plaintiff opposed conduct other than a discriminatory employment practice. *See, e.g.*, *Bonn v. City of Omaha*, 623 F.3d 587, 591-92 (8th Cir. 2010) (holding that the plaintiff did not engage in a protected activity under Title VII by publishing a report exposing a police department's policing tactics that were potentially discriminatory because the report did not implicate employment practices); *Evans v. Kansas City, Mo. Sch. Dist*., 65 F.3d 98, 101 (8th Cir. 1995) (rejecting a Title VII retaliation claim based on "an allegation that [the principal's] efforts to comply with a desegregation directive disregarded the needs of the black student population" because it "lies not with any allegation of a discriminatory employment practice").[1] A plaintiff need not establish that the conduct he opposed was in fact prohibited under Title VII; rather, he need only demonstrate that he had a "good faith, reasonable belief that the underlying challenged conduct violated Title VII." *Bakhtiari*, 507 F.3d at 1137 (brackets omitted).

---

[1]In *Evans*, the plaintiff also brought a § 1981 retaliation claim that we analyzed separately. The ground for rejecting that claim—that the plaintiff could not bring a § 1981 retaliation claim alleging that a third party's rights were violated, *Evans*, 65 F.3d at 101—has since been rejected by the Supreme Court, *see Humphries*, 553 U.S. at 445, 457. Thus, contrary to the defendants' arguments, *Evans* does not necessarily bar Dr. Warren's § 1981 claim. But, as mentioned, Dr. Warren does not advance a theory for § 1981 retaliation independent from her Title VII theory.

We conclude that Dr. Warren did not engage in a protected activity because she did not report an underlying discriminatory employment practice. Dr. Warren does not argue that her report itself was about an employment practice. Rather, she argues that *making* the report was a required employment practice, so she engaged in a protected activity.

But simply performing one's job duties is not itself a protected activity under Title VII; a plaintiff must oppose a discriminatory employment practice. Her case is indistinguishable from *Bonn* and *Evans*, where we held that a plaintiff did not engage in a protected activity when opposing conduct that was not itself a discriminatory employment practice. *Bonn*, 623 F.3d at 591-92; *Evans*, 65 F.3d at 101. Even if Warren was required as interim superintendent to report the disparity in the facilities, this conduct did not constitute opposition to a discriminatory employment practice because the disparity in the facilities had nothing to do with "compensation, terms, conditions, conditions, or privileges of employment." *See* § 2000e-2(a)(1). Indeed, she agrees that her report was about a violation of the students' rights, not employees' rights. Thus, Dr. Warren did not engage in a protected activity by reporting the disparity in the facilities.[2]

Nor can we affirm on the ground that Dr. Warren had a good faith, reasonable belief that she was opposing an unlawful employment practice. *See Bakhtiari*, 507 F.3d at 1137. The jury was never instructed to determine this issue, and Dr. Warren never testified that she believed she was reporting discrimination against employees. Further, there is no other evidence from which a jury could infer that she had a good-

---

[2]At oral argument, Dr. Warren seemed to raise a new argument that, at least for § 1981, her report was about discrimination against employees too and the affected contractual relationship was her own and others' employment contract. Whatever the merits of this theory, she never raised it in her complaint, to the district court, or in her appellate briefs, so we will not affirm on this basis. *See Adamscheck v. Am. Fam. Mut. Ins.*, 818 F.3d 576, 588 (10th Cir. 2016) (rejecting appellee's proposed alternative basis for affirmance because it was unbriefed and raised for the first time at oral argument). Unlike the dissent, we do not address whether the evidence could have been sufficient to support Warren's belated theory of the case.

faith belief that she believed she reported discrimination against employees. At most, Dr. Warren testified that her concern for employees being treated fairly motivated her to file the EEOC complaint. As a whole, the evidence demonstrates that she believed she reported the disparity in the facilities as part of her duty to oversee compliance with the Plan 2000, which sought to rectify discrimination against students in public education. Though we do not rule out that the disparity in the facilities could affect employees too, there is simply no evidence here that Dr. Warren believed she was complaining about a discriminatory employment practice. Thus, a jury could not conclude that Dr. Warren had a good faith belief that she was reporting a discriminatory employment practice.

## III.

For the foregoing reasons, we vacate the judgment and remand the case to the district court to enter judgment as a matter of law for the defendants. We therefore need not address the remaining arguments the defendants raise or Dr. Warren's cross-appeal.

KELLY, Circuit Judge, dissenting.

PCSSD appeals the district court's denial of its post-verdict motion for judgment as a matter of law. See Fed. R. Civ. P. 50(b). Under the applicable standard of review, we cannot set aside the jury verdict finding in favor of Warren on her Title VII retaliation claim[3] unless we conclude that, in light of the evidence presented, "no reasonable jury" could have made factual determinations sufficient to render Warren's conduct statutorily protected. Hopman v. Union Pac. R.R., 68 F.4th 394, 399 (8th Cir. 2023); see Bayes v. Biomet, Inc., 55 F.4th 643, 648 (8th Cir. 2022) ("When reviewing a [Rule 50(b)] motion . . . , our analysis reflects our

---

[3]In light of the district court proceedings and the parties' arguments on appeal, I agree with the court that our analysis of Warren's Title VII and § 1981 retaliation claims "is the same." Sayger v. Riceland Foods, Inc., 735 F.3d 1025, 1030 (8th Cir. 2013).

hesitancy to interfere with a jury verdict." (cleaned up)).  Because the evidence at trial was "legally sufficient . . . to support" the jury's verdict here, Bavlsik v. Gen. Motors, LLC, 870 F.3d 800, 805 (8th Cir. 2017), I would affirm the judgment.

To prove her retaliation claim, Warren had to establish, among other things, that she "engaged in a protected activity."  Bonn v. City of Omaha, 623 F.3d 587, 590–91 (8th Cir. 2010).  Title VII "shields" employees from retaliation for having "opposed a practice made unlawful by" the statute, Barker v. Mo. Dep't of Corr., 513 F.3d 831, 834 (8th Cir. 2008), which includes making statements in opposition to discriminatory "conditions . . . of employment," 42 U.S.C. § 2000e-2(a)(1).  See id. § 2000e-3(a).  Accordingly, the question presented by this appeal is whether there was a "legally sufficient evidentiary basis," Fed. R. Civ. P. 50(a)(1), for the conclusion that Warren's complaints about disparate school facilities within PCSSD concerned, at least in part, an unlawful employment practice.  And a review of the trial record here shows sufficient evidence from which a reasonable jury could have determined that Warren's complaints did, in fact, implicate certain "conditions . . . of employment," 42 U.S.C. § 2000e-2(a)(1)—namely, those faced by a predominantly Black staff[4] working at a school in a predominantly Black community that had facilities that were undisputedly inferior to those enjoyed by the staff at a school in a predominantly white community.

At trial, Warren testified about the "[v]ery, very disturbing phone call" she received from a parent in August 2017 regarding the obvious disparities between the athletic facilities at Mills High School and those at Robinson Middle School. Warren explained that after that call, she requested video footage of the two schools' facilities, which confirmed that Mills's sport complex, while "nice," was "nothing compared to" Robinson's.  And after viewing the footage, Warren reported the disparities to PCSSD's board.

_____

[4]In her brief in opposition to PCSSD's Rule 50(b) motion, Warren explained that in 2017, 67 percent of the administrators at Mills High School were Black, "including the principal and athletic director," and that 58 percent of the school's staff was Black.  Nothing in the trial record contradicts this assertion.

By that point in the trial, those disparities had already been presented to the jury in detail. For instance, jurors heard testimony from Margie Powell, a federal court expert who was directed in September 2017 to "report on whether the sports complex at Mills High School [was] equal to the one located on the site of the Robinson Middle School campus." Powell testified that during her investigation, she "found inequities" between the two schools, "some of" which "were rather gross." According to Powell, the staff members working at Mills's sports complex did not have "nearly the space to work with that Robinson had." Mill's complex also had a "smaller" equipment room than the one at Robinson, the "furniture was different," and the complex was "difficult to get to." Powell's report, which was admitted into evidence, stated that Mills's athletic director, who was Black, "d[id] not have an office" in the new sports complex, while his counterpart at Robinson "ha[d] a separate office" that "include[d] a restroom." And the report further noted that while Robinson's athletic director "was invited (at least twice) to provide input on what he felt was important with respect to [the] design and specific attributes of his school's complex," Mills's athletic director "was not allowed the same privilege."

The jury also heard from Curtis Johnson, PCSSD's director of operations, who testified that "Mills High School was inferior in scope of work and design to that of the Robinson Middle School project." Johnson explained that due to budget shortfalls, the classrooms at Mills—that is, the spaces in which staff members were expected to teach—were the smallest size permitted under state standards. He noted that Robinson had "masonry walls," while Mills "had gypsum board or regular sheetrock walls," which could be more easily punctured and were less safe "in times of storms." And Johnson further noted that the sports complex at Robinson was likewise "made of masonry brick walls," while the complex in which Mills's athletic staff was expected to work was "almost like a metal tin building." A project manager for the architectural firm that was hired to design Mills's new buildings testified about how PCSSD asked the firm to "scale back th[e] project" to cut costs, which resulted in Mills having "gypsum board walls," narrower hallways, less natural lighting, and ceilings that were two feet shorter than originally planned. And,

crucially, jurors viewed the video footage comparing the athletic facilities at Mills and Robinson, which allowed them to see firsthand the extent of the disparities about which Warren complained, and to draw their own inferences about how the inferior facilities at Mills would affect that school's community—including the employees who worked there.

As Warren expressly argued to the district court in opposing PCSSD's Rule 50(b) motion, this evidence "provided the jury with" a legally sufficient basis "for inferring" that PCSSD's "discriminatory construction" of facilities at a school in a predominantly Black community "adversely affect[ed] the employment conditions of" that school's "predominantly black administrators, teachers, and staff." And the district court agreed, explaining in its order denying the Rule 50(b) motion that PCSSD had failed to meet its burden of showing "a complete absence of probative facts to support the conclusion reached by the jury." See Browning v. President Riverboat Casino-Mo., Inc., 139 F.3d 631, 634 (8th Cir. 1998) ("Judgment as a matter of law is proper only when the evidence is such that . . . there is a complete absence of probative facts to support the verdict.").

On appeal, PCSSD attempts to portray its argument in support of reversal as one that raises a "narrow" question of law—namely, whether Warren "engage[d]" in activity that was protected "under the relevant statutes." And it contends that "Warren's reporting about discriminatory conditions" at Mills was not so protected because such "opposition to racial discrimination on behalf of students . . . did not relate to an *employment practice*." But PCSSD's framing of the relevant facts fails to account for the trial record as a whole. In other words, PCSSD's argument presumes that Warren's complaints about inferior school facilities were, as a factual matter, limited exclusively to concerns about the impact that those facilities would have on Black students. Or, at the very least, its argument presumes that Warren's complaints in no way implicated the effect that those same facilities would also have on the predominantly Black staff members who would work in them. See 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination on the basis of race with regard to the "terms, *conditions*, or privileges of employment" (emphasis added)); see also

Wedow v. City of Kansas City, 442 F.3d 661, 671–72 (8th Cir. 2006) (explaining that the provision of discriminatory workplace "facilities" can be unlawful under Title VII if it creates "conditions" of employment that "jeopardize" an employee's "ability to perform the core functions of her job in a safe and efficient manner").

But a court reviewing a Rule 50(b) motion must (1) "consider the evidence in the light most favorable to" the party that prevailed at trial, (2) "assume that all conflicts in the evidence were resolved in favor of" that prevailing party, (3) "assume as proved all facts that the prevailing party's evidence tended to prove," and (4) "give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved." Ryan Data Exch., Ltd. v. Graco, Inc., 913 F.3d 726, 732–33 (8th Cir. 2019) (quoting Washington v. Denney, 900 F.3d 549, 558–59 (8th Cir. 2018)). Once the trial record is so construed, the court must then "determine whether there was legally sufficient evidence to support the jury's liability finding." Bavlsik, 870 F.3d at 805. And as just explained, the evidence in the trial record here was legally sufficient to support the conclusion that Warren's reporting of disparate school facilities implicated in part the "conditions . . . of employment" faced by Mill's predominantly Black staff. 42 U.S.C. § 2000e-2(a)(1).

Framing the question presented here as a purely legal one also overlooks what took place in the district court. At summary judgment, PCSSD treated the material facts regarding Warren's conduct as settled and then argued that those facts did not, as a legal matter, amount to "protected conduct" under Title VII's anti-retaliation provision. The district court denied PCSSD's motion, concluding that "genuine issues of fact" regarding Warren's retaliation claim remained "in dispute." At the close of Warren's evidence at trial, PCCSD filed a motion for judgment as a matter of law, see Fed. R. Civ. P. 50(a), arguing that Warren's report about substandard school facilities in a predominantly Black community was "not protected activity under Title VII" because such complaints concerned "student-based issues and the District's compliance with" federal desegregation orders rather than an unlawful employment practice. The district court summarily denied that motion too,

-14-

explaining that "there [was] sufficient evidence in the [trial] record" for Warren's retaliation claim "to go to the jury."

These decisions indicate that the question of whether Warren's complaints addressed only "student-based" issues or instead an "unlawful employment practice" that affected the conditions or privileges of employment was a *factual* one for the jury to decide. PCSSD, however, did not raise this as a disputed factual issue to the jury in closing argument. Moreover, the jury instructions for Warren's retaliation claim simply asked jurors to find whether Warren "reported a disparity between the construction of Mills High School and Robinson Middle School to PCSSD, its lawyer, or the court"—an instruction that presupposed such conduct qualified as protected activity under Title VII. Yet PCSSD did not object.[5] See Riggs v. Gibbs, 66 F.4th 716, 719 (8th Cir. 2023) (noting that "objections to jury instructions are waived, absent a showing of plain error" if a party does not object to the instructions at trial). Nor did it seek a special verdict asking the jury to specifically find whether Warren's complaints about the inferior facilities at Mills related to an unlawful employment practice.

The evidence in this case was sufficient for a jury to make a reasonable inference that PCSSD's discriminatory approach to the construction of facilities at a school in a predominantly Black community affected the conditions and privileges of employment for that school's predominantly Black staff. "Judgment as a matter of law is appropriate only when the record contains no proof beyond speculation to support the verdict." Am. Bank of St. Paul v. TD Bank, N.A., 713 F.3d 455, 462

_____

[5]To the contrary, the instructions proffered by PCSSD would have asked the jury to find that Warren "complained about facility inequalities at Mills High School and that the facilities were being constructed in a discriminatory manner based on race," and that she "reasonably believed that Mills High School students were being discriminated against on the basis of race." These proposed instructions not only presuppose that complaints about disparate school facilities qualify as protected activity under Title VII, but also that complaints about racial discrimination *towards students* do as well, which directly contradicts the argument that PCSSD now advances on appeal.

(8th Cir. 2013) (cleaned up) (quoting <u>Wilson v. Brinker Int'l, Inc.</u>, 382 F.3d 765, 770 (8th Cir. 2004)). Because that is not the case here, I respectfully dissent.

_____